Exhibit 1

# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

| | |
|---|---|
| CAROL G. EDWARDS, <br>     Plaintiff, <br>  v. <br><br> CITY OF ALTAMONTE SPRINGS, FLORIDA, <br>     Defendant, | Civil Action No. <br> 6:22-cv-689-PGB-DCI <br><br> FOURTH AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL |

## FOURTH AMENDED COMPLAINT
## AND DEMAND FOR JURY TRIAL

## INTRODUCTION

1.    This is a constitutional challenge to defendant City of Altamonte Springs's ("City") imposition of ruinous and continually accruing fines—currently totaling over $250,000—for refusing to tear down a lawfully built dock.

2.    In the late 1980s, plaintiff Carol Edwards ("Carol"), her husband, and their two young children built their family home and a two-story dock and boathouse on their land, located on small inlet off Prairie

Lake. The City issued permits to the Edwards for both the home and the dock. After the construction was completed, the City conducted final inspections, approved of the work, issued certificate of occupancy for the home, and submitted both closed permits to the county tax appraiser. The house was completed in 1988, and the dock was completed the following year. For twenty-eight years, the Edwards family used their dock for boating, swimming, recreation, and gatherings of family and friends.

3.    But in 2017, Hurricane Irma hit. It caused catastrophic damage to property across Florida, including the Edwards's dock. By then, Carol was on her own (her children were grown and her husband had passed away). She asked the City whether she needed permits to repair her dock. It informed her that permits were not necessary to rebuild the dock, because the damage was caused by Irma. The City said that the hurricane damaged everyone's property, and if it required everyone to get permits, it would be overwhelmed and would take months to process. Relying on the City's word, Carol rebuilt the dock in the same footprint, same size, same location, and made some improvements without obtaining permits.

4.    After completion of the dock repairs, a neighbor who had lived across the bay since 1984 purchased the lot next door. He claimed that Carol's dock intruded into the waterway area of his property. The neighbor informed the City, claiming Carol's dock was partially on his land.

5.    In response, the City issued a stop work order and repudiated its 2017 assurances that Carol did not need permits to rebuild the dock. But Carol believed she had a prescriptive easement for any portion of her dock that may have been in her neighbor's waterway. When Carol asked about after-the-fact permits for the improvements, the City informed her that it would not issue any permits because the dock extended into the neighbor's property. Carol attempted to work with the City and submitted five separate building plans for permit approval. All of which were denied.

6.    Then in September of 2018, the City held a hearing at the Code Enforcement Board to present its case against Carol. No one representing Carol was present because the City told her it wouldn't be necessary. Despite that, the City presented evidence against Carol and found her in violation of the City's Land Development Code. The finding

required that within 90 days Carol tear down the dock, after which a fine of $100 per day would be levied until the violations were corrected in addition to a lien on all of Carol's property. Then in April 2019 the City held a hearing to impose fines relating back to December 2018, the deadline to tear down the dock. At the hearing imposing the fines, when Carol's son attempted to dispute the violations and the fines, the City stopped Carol's son from providing any testimony by stating that the violations had already been litigated. Fines were imposed at $100 a day, starting from December 2018, and the order was recorded as a lien on all her property.

7.    Carol, an 83-year-old widow living on a fixed income, is burdened with significant credit card debt because her Social Security and rental income cannot cover her expenses. To pay off this debt, she would need to access equity or sell her investment property, but the lien imposed as a failure to correct the violations attaches to all her real and personal property, preventing her from selling or refinancing either property. As a result, Carol cannot pay the fines that have grown to over $250,000 and faces inevitable foreclosure and bankruptcy.

## PARTIES

6.    Plaintiff Carol Edwards is an 83-year-old widow living on a fixed income, Social Security. She is a natural person, a United States citizen, and a resident of the State of Florida. She is the sole owner of record of the fee simple absolute estate of real property located at 253 Robin Court, Altamonte Springs, Florida 32701, Parcel No. 18-21-30-514-0D00-0330, in Seminole County, Florida.

7.    Defendant City is a municipality organized under Fla. Stat. ch. 165 ("Formation of Municipalities Act"), exercising powers delegated to it under Fla. Stat. ch. 166 ("Municipal Home Rule Powers Act").

## JURISDICTION

8.    This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 (civil actions arising under the Constitution and laws of the United States), and 28 U.S.C. § 1343(a)(3) (civil action to redress for deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States).

9.     Carol has a personal stake in the outcome and has been, and continues to be, actually, concretely, and personally injured-in-fact and has suffered, and is suffering, an actual or threatened injury that can be fairly traced to the challenged actions of the Defendant, and these injuries are likely to be redressed by a favorable decision.

10.    There is an actual controversy between the parties such that this Court may declare the rights and other legal relations of Carol pursuant to 28 U.S.C. § 2201 (Federal Declaratory Judgement Act), whether or not further relief is or could be sought.

## VENUE

11.    Venue is proper in the Middle District of Florida under 28 U.S.C. § 1391(b)(1) and (b)(2)

12.    Defendant City is a Florida municipality located within this judicial district and is a resident of this district.

13.    All or a substantial part of the events or omissions giving rise to the claims asserted herein occurred, and a substantial part of the property that is the subject of this action is situated, within this judicial district.

# FACTUAL ALLEGATIONS

## The Edwards Family Built a Home and Dock

14.     On March 1, 1987, Carol, along with her late husband Troy
M. Edwards, Sr. (collectively "Edwards Family"), purchased lot 253 in the
Town & Country Estates subdivision in Altamonte Springs, FL, situated
on Prairie Lake, Parcel No. 18-21-30-514-0D00-0330, with the address
253 Robin Court, Altamonte Springs, Florida 32701 ("Property").

15.     The Property is located in a cove of a large lake situated in
Altamonte Springs known as Prairie Lake, which is surrounded by
waterfront homes, docks, and facilities for float planes to land and take
off.

16.     In 1988, the Edwards Family hired general contractor Roger
Timlin to prepare building plans, acquire permits, and oversee
construction of a family residence on the Property.

17.     The construction was completed that same year, the City
conducted a final inspection of the home, approved the construction,
closed out the permit, issued a certificate of occupancy, and then

submitted the closed permit to the Seminole County Tax Appraiser's office to assess the completed structure.[1]

18.    In 1989, after completion of the home, the Edwards again hired general contractor Roger Timlin to prepare building plans, acquire permits, and coordinate construction of a dock.

19.    Mr. Timlin prepared a plan to construct a two-story dock with an upper-level deck, attendant storage facility, boat lift, and other water-related facilities on the Property.

20.    The plans for the original 1989 dock were prepared without a survey and did not specify the exact location of the dock.

21.    The plans were submitted to the City and a permit was opened.

22.    Upon completion of the work, the City inspectors conducted a final inspection of the dock, approved the construction of the dock, closed out the permit, and then submitted the closed permit to the Seminole County Tax Appraiser's office to assess the completed structure.

---

[1] Seminole County Property Appraiser,
https://www.scpafl.org/search/parcels/details/?APPRID=5318899, last visited
November 19, 2025.

23.    For nearly thirty years, the Edwards, their family, friends, and neighbors used and enjoyed the dock.

## After the Dock was Damaged by Hurricane Irma, the City Assured Carol She Didn't Need Permits to Rebuild

24.    In 2017, Category-5 Hurricane Irma significantly damaged the Edwards' dock.

25.    By then, Carol was the sole owner of the property (her husband Troy passed away in 2010).

26.    Carol contacted the City and inquired about the need for a permit to repair the dock.

27.    A City official told her it was not necessary to acquire a permit to repair hurricane damage.

28.    Carol misunderstood the scope of the ability to repair the dock and thought that it allowed her to also make limited improvements, and converted her previous storage facility into a small restroom without a permit. She was aware that she would need inspections for the electrical and plumbing installation when the dock was completed, but believed that the statement from the City saying that no permit was necessary to repair hurricane damage would allow her to make this improvement.

29.    However, the repaired dock is still the same size, using the same piling footprint, in the same location, and is the same shape it was when it was originally built in 1989.

## New Neighbor, New Problems

30.    Around 2018, James Randy Myers and his son, Daniel P. Myers (collectively the "Myers") purchased the adjacent lot 251 with knowledge, and a survey, that the dock intruded into the lot they were purchasing.

31.    James Myers had lived across the cove from the Edwards since 1984 and witnessed the building of the Edwards Family home in 1988 and the dock in 1989.

32.    The Myers subsequently complained to the City that Carol's dock intruded into the Myers' property. After an inspection, the City's inspector, Tom Dalton, told Myers the dock would be torn down because of the intrusion onto the Myers' lot and because Carol had made the renovations without a permit.

## City's Stop Work Order

33.    On January 26, 2018, the City left a Red Tag at the Property
to stop work, even though at that time the dock repair was complete and
finished.

34.    As a result of Myers' complaint to the City, Carol met with
City officials to discuss the newly required permits. At this meeting, the
City told Carol that no permit had ever been issued for the original
construction of the dock and that the dock did not meet the ten-foot side-
yard setback as required by a City ordinance. As a result of the code
violations, the City notified Carol that the almost-fully repaired and
renovated dock would have to be torn down.

## First Plan Submittal

35.    On May 14, 2018, Carol submitted the first set of building
plans to the City. Carol submitted an application for a waterfront
improvement, which included a request for a waiver to the ten-foot side-
yard setback. The application included photographs of existing
neighborhood docks which did not meet the setback.

36.    The City provided comments on May 21, 2018. The City's
comments provided that Carol must provide a survey that showed that

the dock was not extending into any neighboring property. The only way
to accomplish this would be to remove the dock.

## Notice of Violation

37.    On May 18, 2018, the City issued a Notice of Violation.

38.    On June 22, 2018, the City, through Code Compliance Officer
Ed Conklin, conducted a follow-up inspection and still found Carol to be
in violation.

39.    Despite the fact that Carol had been attempting in good faith
to obtain permits,  Officer Conklin was not satisfied with the code
enforcement process and emailed other City Officials seeking their
assistance to find other ways to attack Carol. He stated "**I realized we
maybe have another way to go at the owner**."

## Second Plan Submittal

40.    On June 27, 2018, Carol submitted a second set of building
plans.

41.    On July 16, 2018, the City provided comments on the second
set of building plans, stating that a survey would need to be provided
showing the dock does not extend onto any neighbor's property,
essentially requiring relocation or demolition of the dock.

## Discussions with the City

42.    In September 2018, Carol met with City officials and presented evidence that the City records had been destroyed in the early 1990s due to flooding. Carol then produced a copy of the original inspection report with the original permit number for the dock along with her original plans for the dock.

43.    Despite being confronted with evidence of the original permit, City officials took the position that the permit was not finalized because all of the inspections had not been completed, and thus the permit was expired and void.

44.    The City considered the dock repair to be new residential construction and subject to all of the current City codes.

45.    Carol advised the City that she had a prescriptive easement and riparian rights that allowed her to wharf out over the adjacent property. Carol presented evidence that other docks in her neighborhood were built on the side property line and provided photographs showing violations. Carol additionally provided the City with the County Tax Appraiser's affidavit stating that the dock had a final inspection before the dock was placed on the tax roll.

46.     Despite this evidence, the City insisted that Carol either remove the dock or obtain permits for new construction and involved the Florida Department of Environmental Protection (DEP) in the permitting process as "another way to go at [Carol]."

47.     Carol contacted the DEP, who told her that she did not qualify for a general permit and would need to apply for an individual permit. However, the issuance of an individual permit would be subject to the issuance of an Altamonte Springs permit. Furthermore, because the dock was under 1,000 square feet, Carol was told that a DEP permit may not be needed at all, and it might be a waste of time and effort to pursue one.

48.     Carol then attempted to work with the City to bring the dock into compliance, despite that it would require an extensive rework and relocation of the dock. Carol's attorney sent an email to Anthony Apfelbeck, the City's Fire Marshal/Building Official, proposing to make the following changes:

a.     The portion of the dock that was encroaching on the neighbor's property would be moved backwards or shortened.

b.     Carol would file for a permit shortly and work with City staff to bring the structures into compliance with the City codes.

14

c.    Carol would appear before the Code Enforcement Board to
further resolve the issue.

49.    The City agreed to present this proposal to the Code
Enforcement Board.

50.    Carol was advised that she and her attorney did not need to
attend the September 13, 2018, Code Enforcement Board hearing and the
proposal would be read into the record.

## Hearing

51.    On September 13, 2018, the Code Enforcement Board held a
hearing to present the case against Carol.

52.    No one representing Carol was present.

53.    That is because a few hours before the hearing, Fire Marshall
and Building Official Tony Apfelbeck told Carol (through prior counsel)
"**that there is no need for you or your client to attend the Code
Enforcement Hearing tonight**…."

54.    At the hearing Code Enforcement Officer Ed Conklin
"presented the case details, provided testimony and evidence that
established the property ownership and that proper service was provided
for the Notice of Code of Violation and for the notice of Hearing." "Officer

Conklin testified that the Respondent is in violation of Land Development 3.3.1.6 for improving the property without obtaining the required permits and that the work [sic] performed would require Building, Plumbing and Electrical permits."

55.   Officer Conklin also testified that: "[H]e inspected the property on January 26, 2018, that he issued a red tag to stop all work and presented photographic evidence of the work being performed without a permit." He "inspected the property on February 6, 2018, found the Respondent in violation and was told by the owner that her son was trying to obtain a permit for the work in violation." "On May 10, 2018 an additional complaint was received and Deputy Building Official Tom Dalton inspected the property." Officer Conklin "issued a Notice of Code Violation on May 16, 2018 with a compliance date of June 22, 2018." On June 22, 2018, Officer Conklin "performed a follow up inspection," and "found the Respondent still in violation of the cited codes and requested a hearing with the Code Enforcement Board." "Officer Conklin provided [the Board] photographic evidence of the structure in violation and **satellite picture from the Seminole County Property Appraisers website that shows the dock over the property line**." Officer

16

Conklin informed the Board that "**applications for the permits have
been received, but all have been denied**."

56.    After presenting the City's case, "Officer Conklin asked the
Board to find the Respondent in violation of the cited codes, order a
December 13, 2018 compliance date, a fine of $100 per day if found in
violation and award $250 in prosecution costs."

57.    Then Fire Marshall and Building Official Tony Apfelbeck
explained that "City staff have met with the Respondent and their legal
counsel and explained the requirements for compliance." Mr. Apfelbeck
also stated that "Respondent is committed to removing the structure that
is over the property line, coming into compliance by the requested time
frame, pay $100 per day in fines if found not in compliance and pass all
final inspections." And, "If the compliance date becomes an issue and the
Respondent is found to be working towards compliance, the City will also
work with the Board as needed."

58.    Then counsel "representing the neighbor (Mr. Myers, 251
Robin Rd.) of the property that the structure encroaches on, addressed
the Board," to explain that "the current owner, Mr. Myers, has not agreed
to the encroachment."

59.    "The Board Members discussed the encroachment and Board Attorney Sneed stated that the owner of the dock could apply for a variance, and explained the basic requirements."

60.    The Board then voted "to find the Respondent in violation of the cited codes; that the Respondent is to correct the violations on or before December 13, 2018; in the event the Respondent does not comply with this Order, a fine of $100 per day, will be imposed for each and every day the violation continues past the afore stated date and pay the City $250 in prosecution costs."

## The Board's Findings, Conclusions, and Order

61.    Accordingly, the Board issued Findings of Fact, Conclusions of Law and Order. Findings of Fact, Conclusions of Law and Order, dated September 13, 2018.

62.    The Board found that "Respondent was issued a Notice of Code Violation on May 16, 2018 with an April 22, 2018 compliance date for violations of Land Development 3.3.1.6, improvement of property without a permit. A follow up inspection on April 22, 2018 found the Respondent still in violation."

63.     The Board concluded that "Carol G. Edwards, by reason of the foregoing, is in violation of Land Development 3.3.1.6, improvement of property without a permit."

64.     The Board ordered Carol "to correct the violations of the Land Development 3.3.1.6 by December 13, 2018, a fine of $100 per day if found not in compliance and pay $250 prosecution. Compliance includes removing the boat dock and house structure completely and dispose of construction materials; and/or obtain Building, Electrical and Plumbing permits for the structures and pass all final inspections."

## Third Plan Submittal

65.     On the City's Third review, dated November 14, 2018, the City's first comments on the proposed building plans, states:

B1) The cover sheet indicates that this is an existing boathouse and dock. The City's records do not show that a permit was ever obtained to build the boathouse. In addition, the dock never received a final inspection and therefor the permit is void and this is now considered an unpermitted structure. All comments referring to these structures as existing or permitted structures need to be removed from the plans.
**This was noted on the last 2 plan review comment reviews. All comments indicating that these were existing legally permitted structure is to be removed from the plan or it shall be noted that the structures are existing non-approved structures.**

B2) The site plan provided shows that the dock extends into the required easement this condition has not been approved and therefor is not permitted.

B3) A new survey will need to be provided showing that the dock does not extend into the easement and is not on the neighboring property.

…

P1) The plans show an existing bathroom including a toilet and sink being installed. This type of work has not been permitted according to City records.

…

66.     The third review by the Zoning and Code Review provided the following comments:

1.   REPEAT COMMENT. The cover sheet (Sheet SP) in the plan set indicates that this is an existing boathouse and dock. The City does not have records showing that a permits was ever obtained to build the dock or attached boathouse. Revise and resubmit the plans to remove this comment. **Remove reference to prior permits, as the permit was never finaled.**

2.   The coversheet Sheet SP is illegible. Illustrate the entire boat dock expansion and remove all references to "existing" boat dock as the previously constructed boat dock permit was never finaled and was substantially modified without permits; therefore, the entire boat dock is being reviewed as a new structure.

3.   Remove the reference to storm damage/Hurricane Irma. A permit is required for new structures.

20

## Affidavit of Non-Compliance

67.    On December 14, 2018, Code Compliance Officer Ed Conklin inspected the Property and determined that Carol had not completed the actions required by the Board's September 13, 2018 Order.

## Notice of Hearing to Impose Fine

68.    On February 11, 2019, the Board sent Carol notice of the hearing to impose the fine. The notice stated, "You must be prepared to present your case at this time. You must have present all witnesses and documents that you intend to rely[sic] upon. You have the right to be present, to be represented by an attorney, and to subpoena witnesses and documents."

## Fourth Plan Submittal

69.    On April 9, 2019, Carol submitted a fourth set of building plans to the City.

70.    On April 16, 2019, the City provided comments on Carol's fourth set of building plans, stating again that the City's records did not show that a permit was ever obtained to build the dock. The comments also provided that the plan did not meet the setback requirements.

## Code Enforcement Board April 2019—Imposition of Fines

71.    On April 11, 2019, the case was before the Code Enforcement Board to impose fines for violation of Land Development Code 3.3.1.6.

72.    The City's request to the Board was to "[i]mpose the daily fine of $100 per day that started on December 13, 2018, include the $250 in prosecution costs and $18.50 in recording fees."

73.    The Board noted that the "fine began to run as of December 13, 2018," and that Carol "has been in violation for 119 days," that "the fine amount as of April 11, 2019 is $11,900."

74.    Carol and her son were present for the meeting and informed the Board that their legal counsel and engineer could not make it, and as such, they requested a continuance.

75.    The City attorney objected because the "case has been going on since January 2018; is at the Imposing Fine stage and there has not even been a permit issued to date. The work that was done without a permit is along the water, impedes on the neighbor's property and in the easement."

76.    Carol's son stated that "the original dock and boathouse was approved in 1989, permit 89-00675, which was provided to the City."

77.    City inspector Tom Dalton responded by stating that "the case has already been litigated," and that "there was a permit for a boat dock, not a boathouse, it received a framing inspection, but never received a final inspection."

78.    During the meeting, the Board did not discuss and therefore failed to consider any of the factors required of it under Florida law when imposing a fine, including: (1) the gravity of the violation; (2) any actions taken by the violator to correct the violations; and (3) any previous violations committed by the violator. Fla. Stat. § 162.09(2)(b).

79.    The Board found that Carol "failed to comply with this Board's Order of September 13, 2018 and move[d] to impose a fine against [Carol] as set forth in the Board's original Order. The fine shall accrue until compliance…."

### The Order Imposing Fine and Lien

80.    On April 11, 2019, the Board entered an Order Imposing Fine against Carol Edwards for violation of Land Development Code 3.3.1.6.

81.    The Order states that Carol "failed to comply with the Order of this Board dated September 13, 2018, which required you to correct the following violation to comply with the City Code of Ordinances of the

City of Altamonte Springs, Florida on or before December 13, 2018, at
253 Robin Ct., Altamonte Springs, FL 32701."

82.    It states that the corrective action is "Removing the boat dock
and house structure completely and disposing of all construction
materials; and/or obtain Building, Electrical and Plumbing Permits for
the boat dock and house structure passing all final inspections related to
each permit."

83.    The Order stated that Carol will pay the City "the still
accruing fine amount of $12,000, plus $250 in Prosecution Costs and
$18.50 in recording fees, for a current total of $12,268.50."

84.    "A certified copy of this Order may be recorded in the Public
Records of Seminole County, Florida, and shall constitute a lien against
the above described property and upon any other real property or
personal property owned by the Respondent, pursuant to Sections 162.08
and 162.09, Florida Statutes."

85.    The Order was recorded in Seminole County, Florida on April
18, 2019, in Book 9337, Page 735–36.

## Fifth Submittal

86.    On May 30, 2019, Carol submitted the fifth set of building plans to the City.

87.    On July 9, 2019, the City provided comments on Carol's fifth set of building plans. These comments removed the comment from previous submissions that stated that the City's records did not show a permit was ever obtained to build the dock and the previous comment that the dock was extending into the required setback.

88.    The City provided other comments that stated that a boundary survey needed to be submitted, among other repeat comments from previous plan submissions.

## State Court Lawsuit Against the Neighbor

89.    On August 26, 2019, Carol brought a declaratory action in Florida state court against the Myers seeking a declaration of a prescriptive easement and riparian rights over the boat dock.

90.    On December 6, 2019, James Randy Myers was deposed. During the deposition, it was established that he had observed the Edwards house and dock being built because he moved in across the lake in 1984. He acknowledged that he knew the dock was in place that it

extended into Lot 251 before he purchased the property, and that he went
to the City of Altamonte Springs to confirm the dock was on Lot 251. He
also testified that the City told him that they would have it torn down.

91.    On January 3, 2020, the Myers filed a counterclaim seeking a
declaration that Carol does not have a prescriptive easement, and claims
for slander of title, ejectment, trespass, and private nuisance.

92.    After a long discovery process, a few years, and several rounds
of substantive motions, the matter finally came before the court on May
15, 2024 on Carol's motion for summary judgement. Some of the evidence
submitted included the following:

   a. Roger Timlin, the original contractor for the Edwards Family
      home and dock, testified that he pulled the permit for the dock
      in 1989 and that the permit was closed by the City after the
      work was completed.

   b. The City Manager for the City of Altamonte Springs testified
      that there was a permit issued in 1989 for the dock.

   c. Seminole County Property Appraiser David Johnson provided
      an affidavit to explain the process by which a new structure
      gets added to the tax appraiser's tax roll and that the Edwards

26

Family home and dock had been on the county tax rolls for
over thirty years.

d. "For a property to be placed on the tax roll, the property
appraiser's office must be notified by the county or
municipality in which the property is located, that the
property is eligible to be placed on the county tax rolls."

e. "Before a property that has construction or other structures
being erected on said property, it must go through a
permitting process. Once the construction or structures are
completed, the government entity notifies the property
appraiser's office that the construction or structures have
passed a final inspection by the entity, and it is ready to be
placed on the tax roll."

f. He confirmed that "[t]he public records show that [] in 1990,
a dock constructed at 253 Robin Court, Altamonte Springs,
Florida, was placed on the Seminole County tax roll."

g. And, he further stated that "[t]he house located at 253 Robin
Court, Altamonte Springs, FL, and the dock located thereon
would not have been entered on the Seminole County tax roll

if the property appraiser's office had not received a final
permit for both the house and the dock."

h. The original contractor, Roger Timlin, also testified that the
repaired dock is in the same location and is the same size as
it was when it was originally constructed.

i. The long-time neighbor and owner of the engineering firm
that provided the several sets of plans to the City testified
that the repaired dock is essentially the same dock that has
been there since 1989 because it is in the same location as the
previous dock, is the same size, and used the same supporting
posts/pilings, except for a few that were replaced because they
had rotted.

93.   On June 11, 2024, the magistrate in the state court case
issued a report and recommendation in Carol's favor, finding that Carol
had established a prescriptive easement over the portion of the adjacent
property where the dock was located. The Magistrate concluded that
Carol's continuous, open, and adverse use of the area for over twenty
years satisfied the legal requirements for a prescriptive easement under
Florida law. The magistrate also found that: (1) the dock was originally

built in 1989 pursuant to a valid permit; (2) the repaired dock had not moved from its original location, and (3) the repaired dock did not increase the structure's size or result in a greater intrusion on the Myers' land.

94.    On November 7, 2024, the circuit judge entered an order adopting the report and recommendation in full, and final judgment was entered on February 5, 2025, in which the circuit judge confirmed that Carol had established her riparian rights and proven that a prescriptive easement exists as to the dock.

95.    The case finally concluded after the time period to appeal passed and the resolution of attorneys' fees with the final filing on June 10, 2025.

## Carol's Inability to Pay

96.    Carol is an 83-year-old widow living on a fixed income, Social Security. Carol owns two properties, the one at issue in this case which is her homestead, and another property located at 223 Doverwood Road, Fern Park, FL ("Investment Property"). Carol rents out her Investment Property. But, in today's high cost of living her Social Security and rental

income do not cover all her expenses. As a result, Carol currently has significant credit card debt.

97.     Carol's credit card debt has reached the point where she needs to pay off the debt by taking out equity from one of her properties or selling her Investment Property.

98.     Under Florida law the lien attaches to all of her real or personal property, not just the property at issue. Fla. Stat. 162.09(3).

99.     Because of the lien Carol is unable to sell or take out equity on her homestead Property or her Investment Property.

100.   Carol has no ability to pay the fines that have now accrued to over $250,000 and will have to pursue bankruptcy when her properties are foreclosed upon for failure to pay the fines.

## CLAIMS FOR RELIEF

### COUNT I
### Excessive Fines
### Federal Civil Rights Act of 1871
### (42 U.S.C. § 1983)

101.   Carol realleges and incorporate by reference every allegation set forth in the preceding paragraphs.

102.   The Civil Rights Act of 1871 provides:

Every  person  who,  under  color  of  any  statute,  ordinance,

regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress[.]

42 U.S.C. § 1983.

103.  The City is a "person" within the meaning of that term in 42 U.S.C. § 1983.

104.  At all times relevant herein, the City acted under color of state law within the meaning of that term in 42 U.S.C. § 1983.

105.  Carol is a citizen of the United States and a "person" within the meaning of those terms in 42 U.S.C. § 1983.

106.  Carol possesses rights, privileges, or immunities secured by the Constitution and laws of the United States.

107.  The Supreme Court has instructed courts in section 1983 actions to first "identify[] 'the specific constitutional right' alleged to have been infringed." *McDonough v. Smith*, 588 U.S. 109, 115 (2019); *see also Manuel v. City of Joliet*, 580 U.S. 357, 370 (2017) ("threshold inquiry in a § 1983 suit" "requires courts to 'identify the specific constitutional right' at issue") (quoting *Albright v. Oliver*, 510 U.S. 266, 271 (1994)).

108.   The specific constitutional rights at issue here are (1) Carol's right, privilege, or immunity to be free of excessive fines as guaranteed by the Eighth and Fourteenth Amendments; (2) her right, privilege, or immunity to a trial by jury as guaranteed by the Seventh and Fourteenth Amendments; (3) her right, privilege, or immunity to not have her property taken without just compensation; and (4) her right, privilege, or immunity to be free of unconstitutional conditions, as guaranteed by the Fifth and Fourteenth Amendments.

109.   The Eighth Amendment provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments be inflicted." U.S. Const. amend. VIII.

110.   The Eighth Amendment, as incorporated against the States through the Fourteenth Amendment, prohibits government-imposed fines that are grossly disproportionate to the gravity of the offense. *Timbs v. Indiana*, 586 U.S. 146 (2019).

111.   "The touchstone of constitutional inquiry under the Excessive Fines Clause is the principle of proportionality: The amount of the forfeiture must bear some relationship to the gravity of the offense that

it is designed to punish." *United States v. Bajakajian*, 524 U.S. 321, 334 (1998).

112.  The protection against excessive fines guards against abuses of the government's punitive or criminal law enforcement authority, and the safeguard has been held to be fundamental to our scheme of ordered liberty with deep roots in history and tradition.

113.  The City imposing fines totaling over $250,000, and continuing to impose daily fines are, at least in part, a form of punishment and therefore a "fine" within the meaning of the Excessive Fines Clause.

114.  The City's continued refusal to release the lien after a Florida court determined that the dock was lawfully permitted and approved by the City when originally constructed in the 1980's and that Carol has a prescriptive easement to the dock encroachment, is punitive.

115.  The City's aggregate fines are grossly disproportionate to the allegations of encroachment and original 1980's construction without a permit and/or final inspection. Both have since been judicially determined to be false allegations.

116. The City's attachment of the lien to all property owned by Carol, not just the Property alleged to be in violation, is excessive and grossly disproportionate to the alleged offense of failing to remove a structure that has been judicially determined to be lawfully permitted when first constructed and has a prescriptive easement to the encroachment into the adjacent property.

117. Carol has no ability to pay the aggregate fines because she is a widow on a fixed income of Social Security and rental income from her one Investment Property, the combined income of which does not even cover her monthly expenses.

118. The lien significantly impairs Carol's livelihood by threatening her only other source of income, the rental income from her Investment Property because in order to pay the fines she would have to sell or take out equity from her Investment Property. Either of which would take nearly all the value of the Investment Property and leave Carol with nothing, or nearly nothing, afterwards.

119. By the actions set forth above, the City has imposed an unconstitutional excessive fine on Carol.

## COUNT II
## Trial by Jury
## Federal Civil Rights Act of 1871
## (42 U.S.C. § 1983)

120.  Carol realleges and incorporate by reference every allegation set forth in the preceding paragraphs.

121.  The Seventh Amendment provides, "In Suits at common law, where the value in controversy shall exceed twenty dollars, the right to trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise re-examined in any Court of the United States, than according to the rules of the common law." U.S. Const. amend. VII.

122.  The Fourteenth Amendment's Due Process Clause incorporates and renders applicable to the States Bill of Rights protections that are "fundamental to our scheme of ordered liberty or deeply rooted in this nation's history and tradition." *Timbs*, 586 U.S. at 150.

123.  The right to a jury trial in civil actions is a fundamental right that is deeply rooted in this Nation's history and tradition, and it is fundamental to our scheme of ordered liberty. *Securities and Exchange Commission v. Jarkesy*, 603 U.S. 109 (2024).

124. A suit at common law requires "legal claims" and "legal remedies." *Jarkesy*, 603 U.S. at 122–23. Remedies are the predominant and nearly dispositive factor in this analysis. Where, as here, the government demands fines, that is a legal remedy. Moreover, the fine arises from a legal as opposed to an equitable claim because there is a straightforward common-law analog—encroachment or trespass of the dock into the adjacent property. For a claim that is legal in nature, adjudication in court with juries, as opposed to some non-court venue without juries, is "mandatory." *Jarkesy*, 603 U.S. at 128.

125. The Seventh Amendment requires that before it may impose fines and penalties the City must prove its case against Carol to a jury.

126. The City denied Carol's right to a jury trial by imposing fines without conducting a jury trial.

<u>**Count III**</u>
<u>**Fifth Amendment Taking**</u>

127. Carol realleges and incorporate by reference every allegation set forth in the preceding paragraphs.

128. The Fifth Amendment to the United States Constitution, which limits the power of States and their instrumentalities such as the City under the Fourteenth Amendment, prohibits the taking of private

property unless the taking is with "just compensation." U.S. Const. amend. V ("nor shall private property be taken for public use, without just compensation") ("Takings Clause").

129.  The Takings Clause and the Fourteenth Amendment are self-executing limitations on the Town's power to take private property, and this claim for relief arises directly under the U.S. Constitution without need for a statutory cause of action or claim for relief, or any federal or state legislative recognition of a cause of action or claim for relief. *DeVillier v. Texas*, 601 U.S. 285, 291 (2024) ("We have explained that 'a property owner acquires an irrevocable right to just compensation immediately upon a taking' '[b]ecause of 'the self-executing character' of the Takings Clause 'with respect to compensation.'") (quoting *Knick v. Twp. of Scott*, 588 U.S. 180, 192 (2019); *First English Evangelical Lutheran Church v. Los Angeles Cnty*, 482 U.S. 304, 315 (1987) ("We have recognized that a landowner is entitled to bring an action in inverse condemnation as a result of 'the self-executing character of the constitutional provision with respect to compensation....'") (citations omitted)).

130. The bundle of rights associated with the ownership of private property, including, but not limited to, the right to exclude others; the right to possess; the right to alienate; the right to transfer; the right to gift; the right to sell; the right to devise; the right to bequeath; the right to lease; the right to use; the right to develop or to not develop; the right to keep; and the dignity, pride, and sense of self-worth that comes with owning private property.

131. In Florida, rights of ownership associated with ownership includes riparian rights.

132. Riparian rights in Florida are defined as:

> (1) Riparian rights are those incident to land bordering upon navigable waters. They are the rights of ingress, egress, boating, bathing, and fishing and such others as may be or have been defined by law. Such rights are not of a proprietary nature. They are rights inuring to the owner of the riparian land but are not owned by him or her. They are appurtenant to and are inseparable from the riparian land. The land to which the owner holds title must extend to the ordinary high watermark of the navigable water in order that riparian rights may attach. Conveyance of title to or lease of the riparian land entitles the grantee to the riparian rights running therewith whether or not mentioned in the deed or lease of the upland.

Fla. Stat. § 253.141.

133. Florida case law states that:

> Upland owners have common law littoral rights, including: (1) the right to have access to the water; (2) the right to reasonably use the water; (3) the right to accretion and reliction; and (4) the right to the unobstructed view of the water." *Accardi v. Regions Bank*, 201 So. 3d 743, 746 (Fla. 4th DCA 2016) (quoting *Stop the Beach Renourishment, Inc.*, 998 So. 2d at 1111). These rights, which are subject to regulation, are private property rights that cannot be taken away without just compensation.

*BB Inlet Property, LLC v. 920 N. Stanley Partners, LLC*, 293 So. 3d 538 (Fla. 2020).

134. "[R]iparian rights include (1) general use of water adjacent to the property; (2) to wharf out to navigability; (3) to have access to navigable waters; and (4) the right to accretions." *Shore Village Property Owners Ass'n, Inc. v. State Dept. of Environmental Protection*, 824 So. 2d 208, 210 (Fla. 4th DCA 2002).

135. Under Florida law, to establish a prescriptive easement a claimant must prove, by clear and positive proof:

> "(1) actual continuous and uninterrupted use by the claimant or any predecessor in title for the prescribed period of twenty years; (2) that the use was related a certain, limited and defined area of land; (3) that the use has been either with actual knowledge of the owner, or so open, notorious, and visible that knowledge of the use must be imputed to the owner; and (4) that the use has been adverse to the owner, that is, without express or

39

> implied permission from the owner, under some claim of right, inconsistent with the rights of the owner, and such that, for the entire period, the owner could have sued to prevent further use."

*Stackman v. Pope*, 28 So.3d 131 (5th DCA 2010).

136.  "[A]n easement carries with it by implication the right to do what is reasonably necessary for the full enjoyment of the easement itself. Generally, the rights of an easement owner are measured and defined by the purpose and character of the easement." 20 Fla. Jur. 2d "Easements" § 29 (1980); *see also Florida Power Corp. v. McNeely*, 125 So.2d 311 (Fla. 2d DCA 1960).

137.  "The making of repairs and improvements necessary to the effective enjoyment of the use privileged by an easement created by prescription is incidental to the easement," so long as they do not "unreasonably increase the burden on the servant tenement." Restatement (First) of Property § 480 comment a (1944).

138.  Carol owns the Property located at 253 Robin Court, Altamonte Springs, Florida and has lawfully maintained a dock on the Property since 1989 pursuant to a valid permit issued by the City.

139.  Carol also possesses riparian rights and, as confirmed by a final judgment of the Circuit Court of Seminole County, a prescriptive

easement over the portion of adjacent Lot 251 where the dock is located. These rights entitle Carol to maintain the dock in its current location and make improvements necessary to its enjoyment.

140.  Despite these vested property rights, the City has refused to recognize the prescriptive easement and riparian rights and has repeatedly denied Carol's applications for permits and variances solely because the dock does not meet the City's current ten-foot side-yard setback requirement.

141.  The City has ordered Carol to remove the dock entirely or face escalating fines and liens, even though the dock was lawfully constructed, repaired after storm damage, and does not expand beyond its original footprint.

142.  The City acted under the color of Land Development Code 3.3.1.6 when it conditioned permit approval for the dock on a requirement that the dock either be demolished or moved from its existing location that purportedly was on the neighbor's property, when in fact she had a prescriptive easement for the location of the dock.

## COUNT IV
## Unconstitutional Conditions

143.   Carol realleges and incorporate by reference every allegation set forth in the preceding paragraphs.

144.   The Fifth and Fourteenth Amendments forbid the City from conditioning the grant of a permit on the applicant surrendering a constitutional right, unless the City first demonstrates that the condition has an "essential nexus" to any public harm caused by the development, and that the condition is "roughly proportional" to the harm caused. *Nollan v. California Coastal Comm'n*, 483 U.S. 825 (1987), *Dolan v. City of Tigard*, 512 U.S. 374 (1994), *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595 (2013), and *Sheetz v. County of El Dorado*, 144 S. Ct. 893 (2024).

145.   Pursuant to its official policy in Land Development Code § 3.3.1.6, the City has repeatedly denied Carol's applications for permits and variances solely because it refuses to recognize that Carol has a prescriptive based on the erroneous conclusion that Carol's dock does not meet the City's current ten-foot side-yard setback requirement. The City has refused to recognize the prescriptive easement and riparian rights.

42

146.  The City refused to issue an after-the fact permit to Carol to rebuild the dock unless she agreed to demolish the existing dock or move it from its existing location.

147.  The City has ordered Carol to remove the dock entirely or face escalating fines and liens, even though the dock was lawfully constructed, repaired after storm damage, and does not expand beyond its original footprint.

148.  Here, before it may condition its grant of a permit to Carol, the City has the burden to show that there is a nexus between relocation or demolition of the dock and the public impact caused by making improvements to the dock. The City is also required to show that relocation or demolition of the dock is roughly proportional to the public impact caused by the improvements.

149. The City imposed unconstitutional conditions on the permitting approval for the improvements made to the dock by requiring Carol to relinquish her prescriptive easement through demolition or relocation of the dock in order to receive permit approvals for the building, electrical, and plumbing permits.

43

150.   Carol owns the Property located at 253 Robin Court, Altamonte Springs, Florida, and has lawfully maintained a dock on the Property since 1989 pursuant to a valid permit issued by the City.

151.   Carol also holds riparian rights and, as confirmed by a final judgment of the Circuit Court of Seminole County, a prescriptive easement over the portion of adjacent Lot 251 where the dock is located. These rights entitle Carol to maintain the dock in its current location.

152.   Carol owns private property, the fee simple absolute estate in the land and structures located at 253 Robin Court, Altamonte Springs, Florida.

153.   Carol's fee simple absolute ownership includes the entirety of every "stick" in the bundle of rights associated with the ownership of private property, including, but not limited to: the right to use and quiet enjoyment, the right to exclude others, the right to alienate, the right to just compensation if her private property is taken for public use, the right to rely on the City's official assurances that rebuilding the dock did not require she obtain further permits, vested rights under Florida law, riparian rights, a judicially-confirmed appurtenant prescriptive

easement over the portion of adjacent Lot 251, and the right to maintain her dock in its current location.

154.  Carol suffered a cognizable constitutional injury the moment the City demanded that she accede to the unconstitutional demand as a condition on the issuance of a permit for the dock.

155.  In addition, the City's enforcement of the unconstitutional setback requirement directly caused the imposition of escalating fines and the recording of a lien against Carol's home and other property. The City's September 2018 order required compliance with the setback rule by removing the dock or obtaining permits conditioned on demolition or relocation.

156.  When Carol refused to surrender her property rights (her prescriptive easement), the City began imposing daily fines and a lien. This lien has prevented Carol from mortgaging her property and has destroyed its economic value.

157.  The lien was the direct, natural, and probable result of the City's enforcement of the unconstitutional setback requirement.

158.  The City's action is not a general regulation but a targeted enforcement that conditions permit approval on surrendering vested property rights and imposes punitive fines and liens when Carol refuses.

159.  By conditioning permit approval on demolition or relocation of the dock, enforcing the setback requirement despite Carol's vested rights, and imposing fines and a lien that eliminated all economic value of the Property, the City has taken Carol's property without just compensation in violation of the Fifth and Fourteenth Amendments.

## PRAYER FOR RELIEF

Plaintiff respectfully requests this Court grant the following relief:

1.  **Declaratory Judgment—Deprivation of Constitutional Rights:** Issue a declaratory judgment pursuant to 28 U.S.C. § 2201 and Fed. R. Civ. P. 57, that the Defendant has deprived, and is depriving, Plaintiff of rights, privileges, or immunities secured by the Constitution and laws, in violation of 42 U.S.C. § 1983, as follows:

    a.  **Excessive Fines:** Issue a declaratory judgment that the fines imposed on Plaintiff by the City are excessive.

      b.    **Right to Jury:** Issue a declaratory judgment that the City failed to provide Plaintiff a jury trial before the imposition of fines.

      c.    **Unconstitutional condition:** Issue a declaratory judgment that the City has imposed on Plaintiff an unconstitutional condition.

      d.    **Taking without just compensation:** Issue a declaratory judgment that the City has taken Plaintiff's private property for public use without just compensation.

2.    **Injunction—Excessive Fines:** Issue an injunction pursuant to Fed. R. Civ. P. 65 enjoining Defendant and its officers, agents, servants, employees, and attorneys, and other persons who are in active concert or participation with the Defendants, which compels them to release the lien in Plaintiff's name that attaches to all of Plaintiff's property, including but not limited to, Plaintiff's property on 253 Robin Court, Altamonte Springs, Florida 32701 in the continually accruing amount of $250,000.

3.    Issue any writs requiring the City to perform duties owed to the Plaintiff under 28 U.S.C. §§ 1361 and 1651.

4.    **Damages—42 U.S.C. § 1983:** Enter a judgment for damages against Defendant under 42 U.S.C. § 1983 for the violation of Plaintiff's civil rights in an amount to be determined at trial.

5.    **Attorney's Fees—42 U.S.C. § 1988:** Allow to Plaintiff a reasonable attorney's fee as part of the costs.

6.    Such other relief this Court deems just and proper.

DATED: November 24, 2025.

> Respectfully submitted,
> /s/ Loren A. Seehase
> Loren A. Seehase, Fla. Bar No. 1065765
> *Lead Counsel*
> Johanna B. Talcott, Fla. Bar No. 1008094
> Pacific Legal Foundation
> 4440 PGA Blvd., Suite 307
> Palm Beach Gardens, Florida 33410
> Telephone: (561) 691-5000
> lseehase@pacificlegal.org
> jotalcott@pacificlegal.org
>
> Adi Dynar, D.C. Bar No. 1686163 *
> Pacific Legal Foundation
> 3100 Clarendon Boulevard, Suite 1000
> Arlington, Virginia 22201
> Telephone: (202) 888-6881
> adynar@pacificlegal.org
>
> *Counsel for Plaintiff*
> *\*pro hac vice*

# UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF FLORIDA
# ORLANDO DIVISION

CAROL G. EDWARDS,

          Plaintiff,

v.

CITY OF ALTAMONTE SPRINGS,
FLORIDA,

          Defendant,

Civil Action No.
6:22-cv-689-PGB-DCI

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues so triable.

DATED: November 24, 2025.

Respectfully submitted,
/s/ Loren A. Seehase
Loren A. Seehase, Fla. Bar No. 1065765
*Lead Counsel*
Johanna B. Talcott, Fla. Bar No. 1008094
Pacific Legal Foundation
4440 PGA Blvd., Suite 307
Palm Beach Gardens, Florida 33410
Telephone: (561) 691-5000
lseehase@pacificlegal.org
jotalcott@pacificlegal.org

Adi Dynar, D.C. Bar No. 1686163 *
Pacific Legal Foundation
3100 Clarendon Boulevard, Suite 1000

49

Arlington, Virginia 22201
Telephone: (202) 888-6881
adynar@pacificlegal.org

*Counsel for Plaintiff*
*\*pro hac vice*

## CERTIFICATE OF SERVICE

I hereby certify that on November 24, 2025, I served this document

via the Court's electronic filing system to the Defendants:

S. Renee Stephens Lundy
Jessica C. Conner
Dean, Ringers, Morgan & Lawton, P.A.
Post Office Box 2928
Orlando, Florida 32802-2928
Tel: 407-422-4310
Fax: 407-648-0233
RLundy@drml-law.com
BrittanK@drml-law.com
Denise.Covert@drml-law.com
Jessica.Conner@drml-law.com
*Attorneys for Defendants*

/s/ Loren A. Seehase
Loren A. Seehase
Pacific Legal Foundation